[Civ. No. 4491. Third Appellate District.—April 2, 1932.]

J. B. HUBER, Respondent, v. L. SCOTT et al., Appellants.

Edward Bickmore and John Outcalt for Appellants.

F. M. Ostrander for Respondent.

THOMPSON (R. L.), J.—The plaintiff procured a judgment for $5,000 against the defendants for damages sustained in an automobile casualty. The cause was tried with a jury. This appeal was taken from the judgment and order denying a motion for new trial.

The Golden State highway runs southeasterly from Modesto to Merced. The paved portion of this highway is fifteen feet in width with a macadam strip of two and a half feet and an additional oiled gravel shoulder of four feet in width on either side. The entire right of way is sixty feet in width. Adjoining this highway on the easterly side thereof and about four miles southerly from Livingston is the Trainor's Service Station and an auto camp. Mr. C. W. Bryan, who owned the Ford touring car which was involved in this accident, was staying at this camp. The plaintiff was also temporarily located at the same camp. The plaintiff and Bryan were mere acquaintances. They were not associated in business or otherwise. Huber was a painter. He was, however, out of employment at the time of the accident. A building was being constructed by a farmer on a ranch near Livingston. On the morning of March 11, 1930, Bryan drove to Livingston on a business transaction of his own. He invited the plaintiff and a boy by the name of Welch to accompany him. Bryan told the plaintiff he would take him out to the ranch so that he might apply for the painting job. Upon this journey Bryan drove his own car. The boy was seated in the rear seat. The plaintiff rode in the front seat at the right hand of the driver. The day was clear. The pavement was dry. The highway was straight and level.

Returning southeasterly along the highway, about 11 o'clock in the forenoon, as the Ford machine reached a point about sixty feet from the roadway leading into the auto camp, Bryan extended his left arm as a signal, and turned his automobile easterly across the highway toward the camp. At the time of making the signal for his turn across the highway the machine was traveling about twenty-five miles

an hour. The speed was, however, reduced to ten or twelve miles an hour. There was then very little traffic on the highway. Not more than two or three cars were in sight. At the time of making the left-hand turn both Bryan and the plaintiff saw the defendant's Graham-Paige automobile approaching on its proper side of the highway at a point about 350 feet distant. It was running at a high rate of speed. When the front wheels of the Ford car reached the easterly edge of the concrete it was struck with great force by the Graham-Paige car, and the plaintiff was thrown out upon the pavement and seriously injured. This suit for damages was thereupon instituted. The jury returned a verdict of $5,000. Judgment was rendered accordingly. This appeal was then perfected. Neither the amount of the judgment nor the seriousness of the plaintiff's injuries is controverted.

The appellants contend the evidence fails to support an implied finding that they were guilty of negligence, and upon the contrary that it shows the driver of the Ford machine to have been guilty of contributory negligence which is imputed to the plaintiff since he and Bryan were engaged in a joint enterprise at the time of the accident. It is also asserted the court erred in giving certain instructions to the jury at the request of the plaintiff.

The evidence sufficiently supports the finding of negligence on the part of the defendants. Scott, who drove the defendant's car was the agent of D. N. & E. Walter Company. There appears to have been nothing to obstruct Scott's view of the Ford machine as it approached. Scott testified: "I was not paying any particular attention to it. . . . I did see him making that turn." The defendant's machine was running at a high rate of speed. The plaintiff testified in that regard: "I know he was traveling at a high rate of speed, but I cannot estimate the rate. . . . It must have been going sixty miles an hour." The diagram of the scene of the accident is drawn on a scale of ten feet to the inch. Both the plaintiff and Welch located on this diagram the point where the machines collided, the point where the Ford car began to make the turn across the highway, and the point where the Graham-Paige machine was first observed. Both witnesses located the defendant's car at the time it was first seen near the "second telephone pole".

This point is marked on the diagram as "H 3". The point where the Ford car began to make its turn is designated "H 4". The location of the accident is marked "H 1". By scaling the distances between the designated points on the diagram it appears the defendant's car ran nearly 300 feet after it was first seen by the plaintiff before the collision occurred. The Ford car ran about sixty feet from the point where the signal was given to the place where the turn was made. It thus appears the Graham-Paige machine was running at four times the speed of the Ford car. The excessive speed of the defendant's machine is also indicated by the fact that skid marks were left on the pavement for a distance of forty feet to the point of collision. This was caused by the hard application of the brakes. The defendant's car also rolled thirty feet beyond the point of contact with the Ford machine. There appears to be no doubt the defendant's machine was running at a high rate of speed. Since both the plaintiff and Bryan saw the Graham-Paige car 300 feet away, it seems reasonable that Scott, by the exercise of ordinary vigilance, should have seen them, observed their purpose to cross the highway and regulated his machine accordingly. In truth Scott does admit he saw them "making the turn". These facts furnish evidence sufficient to warrant the jury in assuming that the defendant's machine was running in excess of forty miles an hour immediately prior to the collision. This constituted negligence *per se,* as the law then existed. Section 113 of the California Vehicle Act provided in part: "It shall be lawful for the driver of a vehicle to drive the same [on the public highways of this state] at a speed not exceeding the following: . . . (7) Forty miles an hour," under circumstances prescribed by the statute. This section of the act further provides that: "(c) In all charges for a violation of this section, speeds in excess of those set forth in subdivision (b) of this section shall be taken as *prima facie* but not as conclusive evidence of a violation of this section." To drive an automobile at a rate of speed in excess of that which is allowed by statute as it then existed was negligence *per se.* (*Benjamin* v. *Noonan,* 207 Cal. 279 [277 Pac. 1045]; *Fitzpatrick* v. *Haskell,* 117 Cal. App. 684 [4 Pac. (2d) 580].) It was the sole province of the jury to determine whether the defendant's machine was running at an

unlawful rate of speed and whether that excessive speed proximately contributed to the cause of the accident. There is substantial evidence that defendant's machine was running in excess of forty miles an hour. This was negligence *per se.* There are also circumstances from which the jury was warranted in assuming this excessive rate of speed, and possible inattention to his driving prevented Scott from stopping his machine in time to avoid the collision. While there is a sharp conflict of evidence regarding the negligence of the defendants, there is ample proof to support the implied finding that they were guilty of negligence which proximately contributed to the accident and the injuries sustained by the plaintiff as a result thereof.

■ The alleged contributory negligence of both Bryan and the plaintiff was a matter of defense. The burden was on the defendants to establish this charge. Upon the record in this case, we are unable to say as a matter of law that either Bryan or the plaintiff was guilty of contributory negligence. Bryan testified that as he approached the Trainor's Service Station, where he intended to turn across the highway, he reduced the speed of his car and extended his left hand as a signal. The point where he gave the arm signal is marked on the diagram. It is about sixty feet from the place where he actually turned across the highway. This signal conforms to the requirements of section 130 (a) of the California Vehicle Act. Bryan said: ''I saw Scott's car . . . about 300 feet [away], I think.'' There was a truck running 75 or 100 feet ahead of the Ford car. The truck evidently did not obstruct the view of the occupants of the Ford car from the approaching Graham-Paige machine, for they testified to having seen it at the ''second telephone pole'', which was over 300 feet away. It does not seem unreasonable for one to cross a highway when the nearest approaching car is 300 feet away. Bryan had a right to assume the Graham-Paige car was running at a lawful rate of speed. There was no traffic to obstruct the view. It was broad daylight. He had a right to assume that the driver of the approaching car, observing the Ford about to cross its pathway, would, if necessary, slacken its speed so as to permit a safe passage. At least the question as to whether it appeared to Bryan to be reasonably safe

to cross the highway under the circumstances, was a problem for the jury to determine.

 Section 130 (a), *supra*, does provide that: ''The driver of any vehicle upon a public highway before starting, turning or stopping such vehicle shall first see that such movement can be made in safety, and if it cannot be made in safety, shall wait until it can be made in safety.'' This does not mean that a driver may not turn across a public highway until the circumstances render the crossing absolutely free from danger. Such a construction of the law is unreasonable. Construing this section of the California Vehicle Act, the court said in *Ruperto* v. *Thomas,* 113 Cal. App. 523 [298 Pac. 851]:

''This language does not mean the driver of a vehicle may not turn his machine at an intersection of streets unless there is absolutely no possibility of an accident. It must receive a reasonable construction. No specific acts or omissions of the driver of a motor vehicle in changing the course of his machine at the intersection of streets may be characterized as negligent under all circumstances. The negligence of a driver must be determined by an application of the well-settled rule of negligence as to what a reasonably prudent person should do under like circumstances. The language of section 130 (a) above quoted should be construed to mean that the driver of a vehicle upon a public highway, before starting, turning or stopping such vehicle must use such precaution as would satisfy a reasonably prudent person acting under similar circumstances that he could do so safely. The question as to whether the conduct of a driver of a vehicle amounts to contributory negligence under the particular circumstances is a problem for the determination of the trial court or jury.''

 It is contended the evidence in the present case proves that the owner of the Ford car and Huber were co-adventurers engaged in a joint enterprise at the time of the accident, and that the negligence of Bryan in operating his machine is imputed to the plaintiff. The burden of proving a joint enterprise rests upon the defendants. (*Bennett* v. *Chanslor & Lyon Co.,* 204 Cal. 101 [266 Pac. 803].) There is no merit in this contention of the appellants, that a joint enterprise of the parties existed. Bryan and Huber were not engaged in the same enterprise. They

were bent on separate missions. There is no evidence they had ever been interested in the same enterprise. Bryan invited Huber to go with him. He offered, voluntarily, to take the plaintiff out to the ranch where the building was being constructed so that Huber might solicit the job of painting. Bryan said: "I stopped [at Livingston] on my own business." Huber did not even contribute to the expenses of the trip. He neither possessed nor exercised control over Bryan in the operation of the machine. He was a mere invited guest. The doctrine of imputed negligence, based upon a joint enterprise, is not even remotely involved. The case of *Williamson* v. *Fitzgerald,* 116 Cal. App. 19 [2 Pac. (2d) 201], quotes with approval from *Pope* v. *Halpern,* 193 Cal. 168 [223 Pac. 470], as follows:

" 'Parties cannot be said to be engaged in a joint enterprise, within the meaning of the law of negligence, unless there be a community of interests in the objects or purposes of the undertaking, and an equal right to direct and govern the movements and conduct of each other with respect thereto. Each must have some voice and right to be heard in its control and management. It will be seen . . . that in order that there shall be such a joint enterprise it is not sufficient merely that the passenger of the machine indicate the route, or that both parties have certain plans in common, such as a "joy ride", but the community of interest must be such that the passenger is entitled to be heard in the control and management of the vehicle.' " (*Bryant* v. *Pacific Elec. Ry. Co.,* 174 Cal. 737 [164 Pac. 385].)

■ It may not be held as a matter of law that the plaintiff was guilty of contributory negligence in failing to warn the driver of the Ford automobile against turning his machine across the highway under the circumstances of this case.

The question as to whether a passenger should remonstrate with the driver of a machine against excessive speed or other alleged dangerous conduct depends entirely upon the circumstances of the particular case, and is ordinarily a question for the determination of the jury. (*Curran* v. *Earle C. Anthony, Inc.,* 77 Cal. App. 462 [247 Pac. 236].)

■ Finally the appellants contend that the giving of certain instructions by the court at the request of the plaintiff constitutes prejudicial error. The first challenged in-

struction correctly quotes that portion of section 113 of the California Vehicle Act which is applicable to the present case. It then states that "Speed in excess of 40 miles an hour shall be taken as a *prima facie* evidence of violation of the law." It is asserted this charge is misleading and erroneous because it omits that portion of subdivision (c) of section 113, to the effect that such excessive speed shall not be taken as "conclusive evidence of a violation of this section". We think a reasonable construction of the statute does not warrant this criticism. It has been repeatedly held that a violation of the statute as it then existed with respect to the limitation of the speed of a motor vehicle on the public highway, is *prima facie* evidence of negligence. Authorities to that effect have been heretofore cited. To state that such violation is merely *prima facie* evidence of negligence necessarily infers that it is not conclusive. *Prima facie* evidence is a well-recognized term which infers that it is only controlling in the absence of other evidence which rebuts the presumption. (3 Bouvier's Law Dictionary, 2683; 6 Words and Phrases, 1st ser., 5549.) There was no error in the omission complained of.

 The following instruction which was given to the jury at the request of the plaintiff is challenged as erroneous: "If you find from the evidence that the plaintiff J. B. Huber, at the time of the collision, was a passenger or guest in the automobile of C. W. Bryan, *and that he had no control over said automobile*, and was not at the time directing or controlling its movement, then the negligence of Bryan, if there was any negligence on his part, cannot be imputed to plaintiff, Huber, and if, under these circumstances the driver, C. W. Bryan, was negligent, that negligence, if any, cannot defeat a recovery by the plaintiff Huber, provided the negligence of the defendant L. Scott, if any, was the sole proximate cause of the injury or combined with the negligence of C. W. Bryan, if any, in causing an injury to said plaintiff, and provided further that plaintiff himself was in the exercise of ordinary care." It is contended this instruction omits to inform the jury that the negligence of the driver of a machine may be imputed to the passenger if he has the right to control the operation of the machine, even if he does not actually attempt to do so.

All instructions should be construed so as to support a judgment if it is reasonably possible to do so. We are of the opinion the foregoing instruction may be reasonably construed to mean that, "If you find . . . Huber . . . was a passenger or guest in the automobile . . . and that he had no (right of) control over said automobile," etc. To say that one has no control over the operations of a machine ordinarily means he has no authority to control it. This is the evident meaning of that phrase for it is immediately followed by this language, "and was not at the time directing or controlling its movement". If we accept the appellants' construction of the first clause, then the last phrase merely duplicates the same idea. We do not think this instruction could have been misunderstood by the jury. If its meaning is doubtful the instruction which immediately preceded it leaves no question regarding the alleged omission. It reads: "Before any negligence . . . can be imputed to the plaintiff . . . it is necessary that it be shown . . . that plaintiff Huber *had joint authority* with the driver over the control or management in the driving or operation of the automobile." Moreover, at the request of the appellants another instruction was given which clearly incorporates the feature of joint authority to control the operation of the machine. It contains this language: "If you should find . . . that plaintiff Huber and the driver of the automobile . . . were at the time of such accident engaged in a common or joint enterprise or undertaking, *each having an equal right to direct the movements of the car*," etc. In view of the entire charge of the court, it may not be said the challenged instruction is erroneous or prejudicial.

The jury was very fully and fairly instructed. There does not appear to have been a miscarriage of justice.

The judgment is affirmed.

Preston, P. J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 2, 1932, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 31, 1932.